UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PONY LEO JACKSON,<br><br>                 Petitioner,<br><br>v.<br><br>TEREMA CARLIN,<br><br>                 Respondent. | Case No. 1:15-cv-00339-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus, filed by Idaho state prisoner Pony Leo Jackson ("Petitioner" or "Jackson"), challenging Petitioner's state court convictions. (Dkt. 1.) The Court previously dismissed Claims 1, 3, 4, 5, 6, 8, 9, 10, 11, and 16 as procedurally defaulted or noncognizable.[1] (Dkt. 26.) The remaining claims in the Petition are now fully briefed and ripe for adjudication.

The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged with the Court. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is

---

[1] The Court deferred its final ruling on whether Claim 14 was subject to dismissal as procedurally defaulted.

**MEMORANDUM DECISION AND ORDER - 1**

unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief on the remaining claims in the Petition.

## INTRODUCTION

In 2008, Petitioner was charged in the Seventh Judicial District Court in Clark County, Idaho, with two counts of lewd conduct with a minor under sixteen years of age. The charges stemmed from conduct that occurred sixteen years earlier when the victim, K.W., was a four-year-old child. The charges came to light because, during an investigation into other charges against Petitioner, a television news report stated that Petitioner "had been charged with possession of child pornography and that law enforcement authorities were requesting contact from anyone who had been victimized by him." (State's Lodging B-4 at 1-2.) K.W., then an adult, learned of the news report and reported the earlier molestation to police.

Petitioner was convicted of both counts of lewd conduct and sentenced to twenty years in prison with ten years fixed.

Petitioner filed the instant Petition in August 2015. The Court previously dismissed Claims 1, 3, 4, 5, 6, 8, 9, 10, and 11(b) as procedurally defaulted and Claims 11(a) and 16 as noncognizable. (Dkt. 26.) The Court reserved its ruling on whether Claim 14 was procedurally defaulted. (*Id.* at 11-13.) Therefore, Claims 2, 7, 12, 13, 14, and 15 remain for the Court's consideration.

Claims 12, 13, 14, and 15 assert that the prosecutor committed misconduct. Claim 12 asserts misconduct based on the prosecutor's rebuttal argument that allegedly commented on Petitioner's failure to testify. Claim 13 asserts misconduct based on the

prosecutor's eliciting testimony, from K.W.'s mother, that she believed her daughter's allegations against Petitioner. Claim 14 asserts that the prosecutor committed misconduct (a) by referring, in opening statement, to the news report appealing to any victims of molestation by Petitioner and (b) by eliciting testimony from K.W. that she reported the allegations because of that report's request that such victims come forward and notify law enforcement. Claim 15 asserts that, in closing argument, the prosecutor (a) appealed to the passions and prejudices of the jury and (b) impermissibly vouched for K.W.

Claims 2 and 7 are ineffective assistance claims. Claim 2 asserts that trial counsel rendered ineffective assistance by failing to object to the prosecutor's opening statement, which referenced the news report. Claim 7 asserts that trial counsel was ineffective in failing to object to the victim's testimony regarding that report.

## HABEAS CORPUS STANDARD OF LAW

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas relief is further limited to instances where the state court's adjudication of the petitioner's claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court
proceeding.

28 U.S.C. § 2254(d). In determining whether a petitioner is entitled to habeas relief, a

federal court reviews the state court's "last reasoned decision." *Ylst v. Nunnemaker*, 501

U.S. 797, 804 (1991).

When a party contests the state court's legal conclusions, including application of

the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests:

the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established

federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002). Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1) the petitioner must show that the state court—although identifying "the

correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably

applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*,

529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which

a state court unreasonably applies [Supreme Court] precedent; it does not require state

courts to extend that precedent or license federal courts to treat the failure to do so as

error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes in its

independent judgment that the decision is incorrect or wrong; rather, the state court's

application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

AEDPA deference is required even where the state court denied a petitioner's claim without expressly addressing it. In such a case, the federal court must "conduct an independent review of the record to determine what arguments or theories could have supported the state court's decision"; the court must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a decision of the Supreme Court." *Bemore v. Chappell*, 788 F.3d 1151, 1161 (9th Cir. 2015) (internal quotation marks and alterations omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of

Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determination of the state court was not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

Two separate statutory subsections govern a federal court's review of state court factual findings. When a petitioner contests the reasonableness of the state court's factual determinations based entirely on the state court record, a federal court must undertake a § 2254(d)(2) analysis. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). There are two general ways to challenge factual findings as unreasonable under § 2254(d)(2). "First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (internal citations omitted).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable . . . in light of the evidence presented in the State court proceeding." A "state-court factual

determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Under the second subsection dealing with state court factual findings, 28 U.S.C. § 2254(e)(1), such findings are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. In *Taylor v. Maddox*, the Ninth Circuit held that "the presumption of correctness and the clear-and-convincing standard of proof [as set forth in § (e)(1)] only come into play once the state court's fact-findings survive any intrinsic challenge [under § (d)(2)]; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." 366 F.3d at 1000.

However, in *Pinholster*, the United States Supreme Court held that new evidence introduced in federal court "has no bearing" on a merits review of a state court's legal conclusions; therefore, a petitioner cannot receive a federal evidentiary hearing on the merits of any claims that the state court has addressed unless the factual findings of the state court are unreasonable. 563 U.S. at 185. As the Ninth Circuit has explained, *Pinholster* "eliminated the relevance of 'extrinsic' challenges when … reviewing state-court decisions under AEDPA." *Murray v. Schriro*, 745 F.3d at 999. Therefore, the relationship between § 2254(d)(2) and § 2254(e)(1) is not entirely clear. However, any

differences between § 2254(d)(2) and § 2254(e)(1) are rarely determinative. *See Wood*, 558 U.S. at 304-05 ("Because the resolution of this case does not turn on them, we leave for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2)."); *Murray*, 745 F.3d at 1001 ("[W]e do not believe the difference between our two lines of cases is determinative in this case, and thus we need not resolve the apparent conflict to decide this case.").

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of Supreme Court law or by establishing that the state court's factual findings were unreasonable— then the federal habeas court must review the petitioner's claim de novo. *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). De novo review is also required where the state appellate court did not decide a properly-asserted claim or where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167-68. Contrarily, if a state court factual determination is unreasonable, the federal

court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray*, 745 F.3d at 1000.

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

However, some types of claims "are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

## DISCUSSION

### 1. Petitioner's Prosecutorial Misconduct Claims

#### A. *Clearly-Established Law*

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v.*

*Phillips*, 455 U.S. 209, 219 (1982). The Due Process Clause guarantees the right to a fair trial, and prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, such methods will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must consider the record as a whole when making such a determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16-17 (1985); *Darden*, 477 U.S. at 182 (applying *Young*); *see also Donnelly*, 416 U.S. at 647-48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process").

A prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks omitted). However, a prosecutor's closing argument, "billed in advance to the jury as a matter of opinion not of evidence," is "seldom carefully constructed" and may contain "[i]solated passages" that are "less than crystal clear." *Donnelly*, 416 U.S. at 646-47. Therefore, a court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id*. at 647.

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that this standard is a "very general one" that affords state courts "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (internal quotation marks and alterations omitted).

### B.      *Claim 12: Rebuttal Argument and Petitioner's Failure to Testify*

Claim 12 asserts that the prosecutor improperly commented on Petitioner's exercise of his Fifth Amendment right to be free from compelled self-incrimination. Every criminal defendant has a right not to testify, and the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 616 (1965). Not every comment relating to the right not to testify violates the Fifth Amendment, however. The Fifth Amendment is "concerned only with *adverse* comment, whether by the prosecutor or the trial judge"; neutral comments, such as an instruction by the court that the jury may not infer guilt from a defendant's silence, do not offend the Constitution. *Lakeside v. Oregon*, 435 U.S. 333, 338 (1978). Further, a prosecutor's comments on a defendant's choice not to testify will not violate the Fifth Amendment if those comments constitute fair argument offered in fair response to a defense argument. *United States v. Robinson*, 485 U.S. 25, 31-32 (1988).

For example, in *Robinson*, the defendant did not testify. During closing argument, defense counsel argued that the government had breached its "duty to be fair" and had not allowed the defendant to explain himself. *Id.* at 27 n.2. The prosecutor then told the

jury, "[Defense counsel] has made comments to the extent the Government has not allowed the defendant[] an opportunity to explain. It is totally unacceptable. . . . He could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." *Id.* at 28. The Supreme Court held that the prosecutor's statements, taken in the context in which they were made, did not violate the defendant's ent right to be free from compelled self-incrimination. *Id.* at 31. The Court determined that the Fifth Amendment does not "prohibit [a] prosecutor from fairly responding to an argument of the defendant by adverting to [the accused's] silence." *Id.* at 34; *see also Darden*, 477 U.S. at 179 (stating that, when a prosecutor's allegedly improper comments occur in a rebuttal closing, those comments "must be evaluated in light of the defense argument that preceded [them].").

In this case, Petitioner did not testify in his own defense. However, defense counsel elicited testimony, from Detective Steven Anderson, that Petitioner had previously denied committing the crimes:

> Q.   And you had an opportunity to question Pony Jackson?
>
> A.   I did.
>
> Q.   In fact, you did that with another detective, correct?
>
> A.   Yes.
>
> Q.   And in that interview with Pony Jackson, you asked him, didn't you, whether he did these things to [K.W.]?
>
> A.   Yes, sir.
>
> Q.   And his response?

A.     "No."

(State's Lodging A-2 at 158-59.)

During closing argument, defense counsel stated that Petitioner had a constitutional right not to testify: "He's not required to testify. And you cannot take that for anything, a matter of his guilt or of his innocence. He has a constitutional right not to be required to take the stand." However, referring to the above testimony of Detective Anderson, counsel continued, "*But [Petitioner] already did testify to the detective*; and again, he denied any of these things ever happened." (State's Lodging A-2 at 352-53 (emphasis added).) Defense counsel's statement that Petitioner *testified* to Detective Anderson was incorrect; Petitioner was simply making an unsworn statement in a police interview when he denied the allegations.

In rebuttal argument, the prosecutor—apparently responding to defense counsel's mischaracterization of Petitioner's statements to Detective Anderson as "testimony"— stated, "Did we hear any testimony that it didn't happen? I don't recall hearing any testimony that it didn't happen. The only testimony I recall was that it happened." (*Id.* at 356.) Petitioner argues that these statements constituted improper comments on Petitioner's decision not to testify.

The Idaho Court of Appeals properly cited *Griffin* as setting forth the applicable analysis and rejected Petitioner's argument. The court held that, in the context of defense counsel's misstatement that Petitioner "testified" to the detective, the prosecutor's reference to the lack of testimony at trial "can be viewed as fair rebuttal" to that

mischaracterization. (State's Lodging B-4 at 9.) The prosecutor did not "explicitly call[]

for the jury to infer that Jackson was guilty or to convict him on that basis." (*Id*.) Rather,

the prosecutor's comment, "given in response to defense counsel's own improper

argument, was at most an indirect and ambiguous comment on the absence of trial

testimony from Jackson." (*Id*.)

Petitioner asserts that "the only reasonable factual finding" is that "the prosecutor

was commenting on Mr. Jackson's failure to testify in his case-in-chief at the criminal

trial and deny the conduct alleged." (Dkt. 31 at 8.) The Court disagrees. Defense counsel,

whether intentionally or accidentally, mischaracterized Petitioner's interview statements

as "testimony." This might have been a mistake, or it might have been a deliberate

attempt to place the imprimatur of oath-sworn testimony onto Petitioner's out-of-court

denial and to connect Petitioner's denial, at least in the minds of the jurors, with the same

sort of solemnity as the testimony of a witness at trial. The state court appropriately

evaluated the prosecutor's comments "in light of the defense argument that preceded"

them. *Darden*, 477 U.S. at 179. That court's finding that the prosecutor's attempt to

correct defense counsel's mischaracterization constituted a "fair[] respon[se]" to the

argument of the defense was reasonable, *Robinson*, 485 U.S. at 34, and its rejection of

Claim 12 was a reasonable application of *Griffin* and its progeny. *See* 28 U.S.C.

§ 2254(d).

### C. Claims 13 and 15: Eliciting Testimony of K.W.'s Mother as to K.W.'s Credibility, Vouching for K.W. in Closing Argument, and Appealing to the Passions and Prejudices of the Jury

#### i. Claim 13 and 15(b): Eliciting Vouching Testimony by Witness and Personally Vouching for Witness in Closing Argument

Claim 13 asserts that the prosecutor improperly elicited vouching testimony from K.W.'s mother. Claim 15(b) asserts that the prosecutor's statements regarding the believability of K.W.'s story constituted improper vouching.

A prosecutor should not vouch for the credibility of a witness or express a personal opinion about the guilt of the accused. *Young*, 470 U.S. at 18. The Supreme Court has explained that such comments "pose two dangers": (1) they "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"; and (2) they "may induce the jury to trust the Government's judgment rather than its own view of the evidence" because "the prosecutor's opinion carries with it the imprimatur of the Government." *Id.* at 18-19.

In this case, K.W.'s mother testified that she believed her daughter's allegations:

> Q.  Do you have any reason to disbelieve what [K.W.] told you?
>
> A.  No, I don't.
>
> Q.  *And why don't you disbelieve it?*
>
> A.  *I raised her. I know if she's lying. I know if she's telling the truth.* And you can see the hurt in her. And I've seen the changes in her. I've seen—when she was

old enough to drive and date and stuff, she would not.
She would not go out. She would not leave my side. I
made her take driver's ed. She still would not drive.
She—

When we moved to Idaho Falls and got an apartment
in the—like this is my building; this is her building.
It's like she is never away from me. She does—her
comfort zone is to know that I am close enough that
she is—that I'm within distance of her without being
in the same home. Like it's not—it was not my choice
for her to live next to me in Idaho Falls. She can live
wherever she wants. She's 21 years old. It was her
choice.

She is very insecure. She does not want to be away,
out, you know. If she has the choice of going out with
her friends or coming to my house, usually she'll come
over to see me. That's not normal for a 21-year-old
child or a 21-year-old girl in my opinion.

(State's Lodging A-2 at 278-79.)[2]

During closing argument, the prosecutor returned to the issue of K.W.'s credibility

and asked the jury to consider whether K.W. had a motive to fabricate the allegations

against Petitioner:

What is—what's her motive to say these things other than if it
isn't true? I mean, did she just wake up one morning and say,
"Hmm, gee, I'm going to accuse Pony Jackson of molesting
me"? I mean, I don't—we just—we just don't do that. *I mean
it happened. It's believable. Pony Jackson did the things to
her that she said he did.* Whether she remembers them in
exact detail, whether there's a variation over the years, *it
happened.*

---

[2]     K.W.'s mother (like K.W. herself and Detective Steven Anderson), was called as a witness both
by the prosecution and by the defense. The testimony given by K.W.'s mother described in Claim 13
occurred during the prosecutor's cross-examination of the witness after she was called by the defense.

*I would suspect that if there was no variation in her story over the years, I think that would make me believe that she, in fact, was lying.* There is truth in the fact that it varies, truth in the fact, because it varies, that it's true. I mean, *if it's so set out, it would seem to me, with no variation, that one may question her credibility. But it happened.*

(State's Lodging A-2 at 340-41 (emphasis added).)

As for Claim 13, the state court of appeals held that Petitioner did not suffer prejudice from the mother's statements that she believed her daughter.[3] (State's Lodging B-4 at 6.) The court referred to *Reynolds v. State*, 878 P.2d 198, 204 (Idaho Ct. App. 1994), in which the court noted that a "'lay witness who obviously sides with one party'" generally has no more "'than a marginal effect on the jury's determination of the credibility of the victim." (State's Lodging B-4 at 6.) Because the witness vouching for the victim in Petitioner's case was the victim's mother, Petitioner had "not shown a reasonable possibility that the vouching testimony of K.W.'s mother affected the outcome of his trial." (*Id*. at 6-7.)

It was not unreasonable for the state court to find that the testimony of the victim's mother—who likely would more easily believe her child than she would the accused—as to the victim's credibility did not prejudice Petitioner. It was reasonable for the court to conclude that the jurors would not have put much weight, if any, on that testimony. Therefore, even if the prosecutor acted inappropriately in eliciting the testimony of

---

[3] The court alternatively held that this claim was not subject to fundamental error review because the rule against witness vouching, under Idaho law, is not based on a constitutional principle. The Court need not address this issue.

**MEMORANDUM DECISION AND ORDER - 17**

K.W.'s mother about K.W.'s credibility, Petitioner has not established actual prejudice under *Brecht*.

With respect to Claim 15(b), the state court of appeals determined that the prosecutor's argument did not violate the Constitution because "[p]rosecutors are entitled to ask jurors to draw inferences from the trial evidence, including inferences about a witness's credibility." (State's Lodging B-4 at 7.) Petitioner had not established that "the prosecutor was asking the jury to render a decision based on the prosecutor's personal opinion or belief rather than asking the jury to draw reasonable inferences from the trial evidence concerning the victim's credibility." (*Id.*)

This decision was reasonable in light of *Donnelly*, which instructs that a court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." 416 U.S. at 647. To this Court, one statement in particular skirts the edge of propriety—the prosecutor's statement that if the victim's story had no variation, that "*would make me believe* that she, in fact, was lying." This could have implied to the jury that, because there was such variation in the victim's story, the prosecutor believed the victim was telling the truth. However, the Court must apply AEDPA deference, and the Court does not deem it unreasonable for the Idaho Court of Appeals to have decided that the comment was not improper. The prosecutor's argument "contained no suggestion that [the prosecutor] was relying on information outside the evidence presented at trial." *Young*, 470 U.S. at 19. Therefore, it was not unreasonable for the court of appeals to find that the prosecutor was not injecting

a personal opinion as to the victim's credibility, but was instead simply inviting the jury to make inferences from the evidence.

     ii.     <u>Claim 15(a): Appealing to Passions and Prejudice</u>

Petitioner asserts in Claim 15(a) that, when asking the jury not to punish K.W. for waiting to report the molestation, the prosecutor inappropriately appealed to the passion and sympathy of the jury. *See Darden*, 477 U.S. at 192 (stating that a prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." (internal quotation marks omitted)).

The prosecutor's closing argument included the following statement:

> And the reason [the victim] came forward [16 years later] is, when she heard the news article—or I should say media report—that those who have something to say about Pony Jackson molesting them ought to come forward, she came forward. *And she ought not to be held or punished again for waiting to come forward.*

(State's Lodging A-2 at 341-42.)

The Idaho Court of Appeals stated that this comment "might be viewed as seeking to invoke sympathy." (State's Lodging B-4 at 8.) However, the court stopped short of finding a constitutional violation and held that there was no "plain, clear, or obvious" error sufficient to meet the fundamental error standard. (*Id*.) Further, the court held that the statement was not "of such moment that there is a reasonable possibility that it altered the outcome of the trial." (*Id*.)

Again, this decision was reasonable in light of the Supreme Court's decision in *Donnelly*. The meaning behind the prosecutor's statement was "less than crystal clear,"

and the Court cannot infer that the prosecutor affirmatively intended to inflame the passions and prejudices of the jurors or that the jurors based their decision on the prosecutor's argument rather than the evidence produced at trial. 416 U.S. at 646. Moreover, the statement was not so deeply moving as to establish actual prejudice. *See Brecht*, 507 U.S. at 637.

Therefore, Petitioner is not entitled to relief on Claim 15(a).

### D. Claim 14: Prosecutor's Opening Statement Referencing News Report and Prosecutor's Eliciting Testimony from K.W. Regarding that News Report

Before Petitioner's trial, the prosecutor notified the court that he intended to inquire into the victim's reasons for her delayed reporting, recognizing that such questioning might lead to testimony about the uncharged child pornography allegations. The trial court ruled that the victim could testify generally that she saw a news report about Petitioner and that the report prompted her to come forward, but that she could not testify that the report was about Petitioner's arrest on child pornography charges or that the report indicated anything that was not "general and innocuous":

> Prosecutor: Okay. The other issue I've got is, [K.W.], she is now 21. This happened when she was four years old. The way this came about is, is that a couple of years ago, in 2007, she was watching the news and Pony Jackson had been arrested for child pornography and the news said if anyone out there has been molested by Pony Jackson, would you please contact the law enforcement. I mean, that's kind of my paraphrasing of it.
>
> And so my question is, I'm sure [defense counsel's] going to object to that—to that kind of information coming in; and I just—I want to know the boundaries on this. Again, I don't want any mistrials or appealable

issues. Do you want me to avoid that issue until [defense counsel] raises it? I mean, I think I can get—I think I can say, "Did you contact law enforcement and for what reason did you contact law enforcement," without getting into the—

The Court: Right. If you can, I mean, that's going to be much better. It's going to be problematic if she's—if this evidence of charges for child pornography come in because that can be unfairly prejudicial. I mean, certainly she can testify that she became aware that he was involved. Well—

Prosecutor: Yeah. I mean, how do we—how does the jury understand that all of the sudden she—because I think part of [defense counsel's] defense is that why wait all this time and then all of a sudden you do it. So how do I—

The Court: *Well, she can testify*—and this may take some coaching on your part so we don't get into a problem—but *that she saw a report about Pony Jackson and*—

Prosecutor: But don't mention it was on child pornography; she saw a report?

The Court: Yeah, it *wasn't based on child pornography issues* but that he was involved—that . . . *there was a law enforcement inquiry regarding Pony Jackson and that prompted her to come forward, something general and innocuous like that*. Certainly she can talk about this was generated by a law enforcement inquiry; *but if she can stay away from the charges*, we're going to be a lot better off.

Prosecutor: Okay, I think I can coach her on that. I talked to her about that yesterday too. And, of course, a lot of that depends on what [defense counsel] ask[s] her on cross-examination, what I can get into, I'm assuming, after that. But that's the way—those are my—

| The Court: | So, I mean, that—*the evidence of prior crimes and prior acts can come in if the door gets opened on that. But, I mean, right now that—you want to treat that as being unfairly prejudicial*, the prejudice doesn't outweigh the probative value [sic]. But if there's a door gets opened, then that does come in. |

(State's Lodging A-2 at 33-36 (emphasis added).)

Despite the court's order, the prosecutor explained in his opening statement the reason why K.W. reported the molestation sixteen years later as follows:

> If I remember right, [K.W.], when this initially happened, she told her mother as I recall; but it wasn't until 2007, in January of 2007, when *there was a report on the news that anybody who had been molested by Pony Jackson, if they would contact the sheriff's office* or law enforcement officer had wanted them to do that. . . . And that's when she came forward and contacted the Jefferson County Sheriff's Office about this molesting that happened when she was four years old, living with her grandparents here in Clark County. And that's when Officer Anderson investigated it, and that's how we got here today.

(*Id.* at 136 (emphasis added).) Defense counsel did not object.

On direct examination of K.W., the prosecutor asked her what prompted her to report Petitioner's conduct sixteen years after it occurred. She responded, "My mom called me and told me that *on the news they had said that Pony Jackson had been arrested and that anybody else that had been molested by him, to please come forward*."

(*Id.* at 186 (emphasis added).) Again, defense counsel did not object.

### iii. Claim 14 Is Not Procedurally Defaulted and Must Be Reviewed De Novo

Petitioner raised Claim 14 on direct appeal, arguing that the prosecutor committed misconduct by violating the trial court's order regarding the news report and its

suggestion that Petitioner may have molested other children. (State's Lodging B-1; B-3.) But the Idaho Court of Appeals did not address that argument. Instead, the court reframed Petitioner's argument as one made pursuant to Idaho Rule of Evidence 404(b). (State's Lodging B-4 at 4 (reconstructing Petitioner's argument into a claim that "the presentation of evidence and associated argument in violation of an evidentiary rule satisfies the constitutional violation element of *Perry* because all evidentiary error implicates due process"). The court of appeals held that, because Petitioner's claim was (purportedly) based on an evidentiary rule and not a constitutional right, it was not subject to fundamental error review. (*Id.* at 5.)

It is plain from a review of Petitioner's appellate briefing, however, that Petitioner's claim was based squarely on the allegation of prosecutorial misconduct—not merely a vague notion of due process or a violation of Idaho Rule of Evidence 404(b). Because the state court of appeals did not decide Petitioner's properly-asserted federal claim, Claim 14 is not subject to AEDPA's restrictions set forth in § 2254(d). *See Pirtle*, 313 F.3d at 1167. Rather, the Court will review Claim 14 de novo.

  iv.  <u>On De Novo Review, the Court Concludes Petitioner Is Not Entitled to Relief on Claim 14</u>

When addressing Petitioner's claim that his counsel was ineffective for failing to object to the prosecutor's reference to the news report and for failing to object to the victim's testimony about that report (Claims 2 and 7), the initial post-conviction court held that the prosecutor did not violate the trial court's order because he did not mention the child pornography charges that were the subject of the news report. (State's Lodging

C-1 at 206.) The Idaho Court of Appeals disagreed and concluded that "the trial court's ruling was broad and prohibited any mention of any collateral criminal charges or allegations," not simply the child pornography charges. (State's Lodging D-4 at 6.) This is a reasonable factual determination as to the scope of the trial court's order and is presumed correct. *See* 28 U.S.C. § 2254(e)(1).

Therefore, the prosecutor violated the trial court's order permitting only "general and innocuous" references when describing the law enforcement inquiry and news report that prompted K.W. to come forward with the allegations against Petitioner. It was certainly *not* general or innocuous (a) to refer to the news report as seeking "anybody who had been molested by" Petitioner, or (b) to elicit testimony from K.W. that the report was asking "anybody else that had been molested by him, to please come forward." (State's Lodging A-2 at 136, 186.)

However, that the prosecutor violated the trial court's order is not the end of this Court's inquiry. Petitioner is entitled to relief on Claim 14 only if he can establish that the misconduct had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946). Petitioner has not done so.

The potentially prejudicial nature of the prosecutor's actions in Claim 14 stems from the likelihood that, having heard there had been a news report seeking "anybody" or "anybody else" who had been molested by Petitioner, the jury would assume that Petitioner was a serial child molester and that, therefore, he was guilty of molesting K.W. However, even if the prosecutor had not mentioned the report, and even if the victim did

not testify about that report, the jury still would have been aware that another child had accused Petitioner of molestation.

Evidence that Petitioner had committed sexual misconduct with K.W.'s minor cousin was, in fact, introduced at trial. This evidence had nothing to do with the information about the news report or the conduct of the prosecutor.

First, on cross-examination of the victim's mother, defense counsel brought up an incident, when K.W. was two years old, where Petitioner had allegedly exposed himself to the child:

> Q.    Were your parents aware of allegations that your daughter had made about Pony Jackson when she was two years old?
>
> A.    Yes.
>
> Q.    And how were they aware of that?
>
> A.    Because we had taken [K.W.] to Rexburg to see—to seek help through the—I think we took her to the State Department for Children for Health and Welfare.
>
> Q.    And that was regarding what allegations?
>
> A.    Exposure.
>
> Q.    Exposure by whom?
>
> A.    Pony.
>
> Q.    To your daughter, Kendra?
>
> A.    Yes.
>
> Q.    What happened as a result of that investigation?
>
> A.    *There was an investigation for her and also another cousin.* Pony was picked up at my parents' house,

taken into custody, and then released, and nothing ever
happened.

(State's Lodging A-2 at 243-44 (emphasis added).)

Petitioner's attorney also elicited the following testimony from Detective Steven
Anderson:

> Q.    As part of your investigation, you learned of an alleged
> incident with [K.W.'s] cousin . . . .
>
> . . . .
>
> Q.    And you've heard testimony . . . about that?
>
> . . . .
>
> A.    Yes.
>
> Q.    *And in that investigation that you did, as far as the
> claims that [K.W.'s cousin] made against Mr. Jackson,
> the extent of those claims was that he had exposed
> himself to her, correct?*
>
> A.    *Correct.*
>
> Q.    She had never alleged that he had molested her,
> correct?
>
> A.    I don't know about that. I could not find any reports.
>
> Q.    You, in fact, got a written statement from her, didn't
> you?
>
> A.    I did, yes.
>
> Q.    And you recall that that report indicates that that was
> the only allegation was that he had exposed himself?

(*Id.* at 262-63 (emphasis added).) The trial court then sustained an objection that the
contents of the reports were hearsay and not within Detective Anderson's personal
knowledge. (*Id.* at 264.)

**MEMORANDUM DECISION AND ORDER - 26**

Finally, Petitioner's counsel engaged in the following discussion with the victim about the allegation that Petitioner had molested her cousin:

> Q.    *You had talked to your cousin . . . about the allegations of abuse* while you were living there at your grandparents' farm in 1992, right?
>
> A.    I told her he'd done something to me, but I never told her exactly.
>
> Q.    So you never told her exactly what he did, right?
>
> A.    I never told her exactly what happened.
>
> Q.    *You told her, though, that he had done the same thing that he had done to her, right?*
>
> A.    Just meaning that *he touched me also like he'd done to her.*
>
> . . . .
>
> Q.    *When you told her that he had done the same thing that he had done to her, you had meant that he had molested you as well, right?*
>
> A.    *That's what I meant.*

(*Id*. at 281-82 (emphasis added).) Because the jury heard evidence that Petitioner molested K.W.'s cousin, the prosecutor's and K.W.'s references to the news report—which asked "anybody" or "anybody else" who had been molested by Petitioner to come forward—could have had very little additional impact in the minds of the jurors.

Claim 8 of the Petition asserts that Petitioner's trial counsel rendered ineffective assistance by eliciting the testimony about K.W.'s cousin from K.W.'s mother, from Detective Anderson, and from K.W. However, the Court cannot review that claim because, as previously determined, Claim 8 is procedurally defaulted and Petitioner has

not established a legal excuse for that default. (Dkt. 26 at 6-10.) Therefore, the evidence that Petitioner was accused of molesting K.W.'s cousin must be treated as properly before the jury. Because of the procedural default of Claim 8, the evidence of Petitioner's actions toward K.W.'s cousin is now unchallengeable.

Given that the jury would have heard evidence of another potential victim even if the prosecutor had not committed the misconduct described in Claim 14, Petitioner cannot show that the misconduct had a substantial and injurious effect on the jury's deliberation. The testimony regarding K.W.'s cousin was more specific, and therefore more damaging, than the prosecutor's and K.W.'s references to the news report and its invitation to potential victims. Therefore, there is little chance that the statement and testimony regarding the news report would have made a difference in Petitioner's trial absent the prosecutor's misconduct, and Petitioner is not entitled to relief on Claim 14.

### E.    *Petitioner's Collective Prejudice Argument*

Petitioner accuses the Idaho Court of Appeals of engaging in a "divide-and-conquer tactic to defeat" Petitioner's prosecutorial misconduct claims. (Dkt. 31 at 17.) Noting that prosecutorial misconduct claims are to be evaluated "in the context of the entire trial," Petitioner asserts that the various instances of misconduct or alleged misconduct referred to in Claims 12 through 15 "cannot be viewed separately in a vacuum" and that the "combined weight of this misconduct had a substantial and injurious influence or effect on an otherwise close case that rested on the word of a young adult testifying about events that had occurred almost two decades earlier." (*Id*. at 18-19.)

Petitioner is correct that prosecutorial misconduct claims should be evaluated in the context of the entire trial. *Donnelly*, 416 U.S. at 639 (considering "whether [the prosecutor's] remarks, in the context of the entire trial, were sufficiently prejudicial to violate [the accused's] due process rights."). However, though the state court of appeals separately discussed the instances of alleged misconduct and the prejudicial effect of that misconduct, this Court will not presume that the state court actually limited its prejudice analysis where that court did not "expressly" do so. *See Royball v. Davis*, 148 F. Supp. 3d 958, 1047 (S.D. Cal. 2015). In any event, the Court concludes on de novo review that, even when considered collectively, the instances of misconduct or alleged misconduct did not cause actual prejudice under *Brecht*.

The idea of cumulative prejudice presupposes multiple constitutional errors which—if each were considered alone—might not have prejudiced the defendant; if these errors are considered collectively, however, prejudice might indeed be shown. Here, the Idaho Court of Appeals reasonably found no prosecutorial misconduct, and thus no error, as to Claims 12 and 15(b). Thus, the prosecutor's comments described in these claims do not figure into any prejudice analysis, either individually or collectively.

With respect to the events described in Claims 13 (eliciting vouching testimony from K.W.'s mother) and 15(a) (stating that the victim should not be punished again for coming forward), the state court of appeals did not address whether those events constituted prosecutorial misconduct, instead focusing on whether those comments prejudiced Petitioner. (*See* State's Lodging B-4 at 6 ("[T]he testimony of the victim's mother here would not lead us to reverse Jackson's conviction, for he has not shown that

the error affected the outcome of the trial."), 7-8 ("While [the prosecutor's statement about punishing the victim again] *might* be viewed as seeking to invoke sympathy, it does not meet the *Perry* standard that the constitutional error be plain, clear, or obvious. Nor could we find that it was of such moment that there is a reasonable possibility that it altered the outcome of the trial.") (emphasis added).) The Court agrees with Petitioner that the prosecutor committed misconduct by violating the trial court order regarding the news report as described in Claim 14, but the misconduct alleged in Claims 13 and 15(a) is the only other conduct that can be weighed alongside Claim 14.

Having considered the alleged misconduct of Claims 13 and 15(a) together with the misconduct of Claim 14, the Court concludes that Petitioner still has not established actual prejudice under *Brecht*. Given the presence of the now-unchallengeable evidence that Petitioner had molested K.W.'s cousin, the Court cannot conclude that the outcome of the trial would have been different absent the prosecutor's actions set forth in Claims 13, 14, and 15(a). The jury was already aware that there was at least one other child who had accused Petitioner of sexual molestation. Any additional impact that the conduct described in Claims 13, 14, and 15(a)—the comments and testimony regarding the news report, K.W.'s mother's vouching testimony, and the statement about the victim being punished again—might have had on the jury's verdict is only slight.

Because Petitioner has not established prejudice from the prosecutor's actions, either individually or collectively, he is not entitled to relief on any of his prosecutorial misconduct claims.

## 2. Ineffective Assistance Claims

### A. *Clearly-Established Law*

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The standard for ineffective assistance of counsel claims was identified in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. *Id.* at 697.

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id*. at 694. As the

*Strickland* Court instructed:

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual
> findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in
> different ways. Some errors will have had a pervasive effect
> on the inferences to be drawn from the evidence, altering the
> entire evidentiary picture, and some will have had an isolated,
> trivial effect. Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result

must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de

novo standard of review. Another layer of deference—to the state court decision—is

afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an

incorrect application of federal law." *Williams*, *supra*, at 410,
120 S. Ct. 1495. A state court must be granted a deference
and latitude that are not in operation when the case involves
review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. That is, when evaluating a claim of ineffective assistance of

counsel in a federal habeas proceeding under § 2254(d), the Court's review of that claim

is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation

marks omitted).

### B.      *Petitioner Is Not Entitled to Relief on Claims 2 or 7*

In Claims 2 and 7, Petitioner asserts that his trial counsel rendered ineffective

assistance in failing to object to the prosecutor's reference to the news report during

opening statement or to the testimony of K.W. about the news report.

The Idaho Court of Appeals determined that Petitioner's trial counsel's failure to

object in both of these instances was not strategic and amounted to deficient performance.

(State's Lodging D-4 at 8-9.) However, the court went on to conclude, under the second

prong of *Strickland*, that Petitioner had not established a reasonable possibility that,

absent that deficient performance, the outcome of the trial would have been different:

> If Jackson's attorney had timely objected, the State's oblique
> references to his other misconduct may have been cured and
> the second reference may not have been made at all. But
> preventing or mitigating the impact of those references would
> not have affected the trial outcome because numerous other,
> more specific references to Jackson's prior sexual conduct
> were introduced into evidence. When cross-examining the
> victim's mother, Jackson's attorney elicited testimony that
> Jackson had been accused of molesting another child, K.W.'s
> cousin. Defense counsel also called as a defense witness a
> police officer who had investigated K.W.'s allegations. He
> testified that he had received reports that Jackson had exposed

himself to another girl, K.W.'s cousin. Finally, defense counsel called K.W., the alleged victim, and elicited her testimony that she believed Jackson had molested the cousin, explaining her belief that Jackson had "touched me also like he'd done to her."

*Because of this evidence, the jury would have been fully aware of reports that Jackson had engaged in sexual conduct with another minor even if the State's oblique references in the opening statement and in K.W.'s direct testimony had not occurred. Those mere implications of prior bad acts were of little moment once particularized descriptions of uncharged sexual misconduct had been adduced.* Accordingly, Jackson did not demonstrate that his attorney's failure to object to the prosecutor's actions adversely impacted the outcome of his case.

(*Id.* at 9-10 (footnote omitted) (emphasis added).) The court of appeals reasoned that the evidence of sexual misconduct adduced by Petitioner's counsel was "far more damaging" than the "oblique" references to other potential molestation victims made by the prosecutor and K.W. (*Id.* at 10.)

This was a reasonable application of *Strickland*, and the state court made no unreasonable factual findings. As explained above with respect to Petitioner's prosecutorial misconduct claims regarding the references to the news report, any impact that those references could have had is minimal when considered alongside the more specific allegations that Petitioner had molested K.W.'s cousin just as he had done to K.W. Thus, Petitioner is not entitled to relief on his ineffectiveness claims under 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the remaining claims in the Petition will be denied.

**MEMORANDUM DECISION AND ORDER - 35**

# ORDER

**IT IS ORDERED:**

1.      The remaining claims in the Petition for Writ of Habeas Corpus (Dkt. 1) are

DENIED.

2.      The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If

Petitioner wishes to appeal, he must file a timely notice of appeal with the

Clerk of Court. Petitioner may seek a certificate of appealability from the

Ninth Circuit by filing a request in that court.

DATED: November 7, 2017

B. Lynn Winmill
Chief Judge
United States District Court